**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DANNY RUSSELL, as next friend to B.R. and next of kin to DANIEL JORDAN RUSSELL, deceased,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 1:25-cv-01100-STA-jay** |
| **FRANKIE SCOTT, BLAKE JENKINS, MIRANDA GARNER, and JOHN DUNN, in their individual and official capacities, and HENRY COUNTY, TENNESSEE,** | ) | |
| **Defendants.** | ) | |

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING MOTION TO DISMISS OF COUNTY DEFENDANTS**

Plaintiff Danny Russell, next friend of B.R. and next of kin of Daniel Jordan Russell ("the Decedent"), filed this action pursuant to 42 U.S.C. § 1983, alleging that Defendants Frankie Scott, Blake Jenkins, John Dunn, and Miranda Garner, in their individual and official capacities, and Henry County, Tennessee, violated the Decedent's Fourth and Fourteenth Amendment rights while restraining the Decedent during a traffic stop and subsequent arrest. Defendants Scott and Jenkins and Henry County have filed a motion to dismiss (ECF No. 43), Plaintiff has filed a response to the motion (ECF No. 48), and Defendants have filed a reply to Plaintiff's response. (ECF No. 51.)[1]

[1] Defendants Dunn and Garner have also filed a motion to dismiss (ECF No. 44) which is the subject of a separate order.

For the reasons set forth below, Defendants' motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

Standard of Review

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992). Under *Twombly* and *Iqbal*, Rule 8(a)'s liberal "notice pleading" standard requires a complaint to contain more than a recitation of bare legal conclusions or the elements of a cause of action. Instead, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

The parties have submitted video footage of the events in question. Concerning video usage by a Court in ruling on a motion to dismiss, the Sixth Circuit has explained:

> In the motion-to-dismiss context, "we have consistently held that we may only consider ... video footage over the pleadings when 'the videos are clear and blatantly contradict[ ] or utterly discredit[ ] the plaintiff's version of events.'" *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024) (alterations in *Saalim*) (quoting *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022)). "This is because if a video clearly depicts a set of facts contrary to those alleged in the complaint, this makes a

> plaintiff's allegations implausible." *Id.* "But when the video does not blatantly contradict or utterly discredit the complaint, we do not consider it on [a] Rule 12 motion. Instead, as when assessing any motion made under Rule 12, we rely on the allegations in the pleadings alone." *Id.*

*Hodges v. City of Grand Rapids*, 139 F.4th 495, 506–07 (6th Cir. 2025). Therefore, in deciding Defendants' motion, the Court must "determine whether the officers' proffered video evidence blatantly contradicts or utterly discredits [Plaintiff's] allegations" concerning the underlying events. *Id.* at 507. "So long as their allegations are not blatantly contradicted or utterly undermined by video evidence, the plaintiff need only allege facts that give rise to the plausible inference that the defendants violated a clearly established right. The officers cannot escape this fundamental rule by arguing that the video shows a more complete picture of the events than the complaint; that is an argument for summary judgment or for trial." *Id.* at 509 (citations omitted). *See also Lovell v. Clermont Cnty. Sheriff's Off.*, No. 26-3031, 2026 WL 2241215, at *7 (6th Cir. Aug. 4, 2026) ("Even with video evidence, however, we must nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the [p]laintiff." (citations omitted)).

<u>Background/Analysis</u>

According to the amended complaint (ECF No. 35), Defendant Frankie Scott is a Henry County Deputy Sheriff who initiated pursuit of the Decedent as the Decedent was driving, deployed his Taser and pepper spray against the Decedent, and participated in the restraint of the Decedent. Defendant Blake Jenkins is a Henry County Sergeant who applied a final restraint maneuver and administered Narcan to the Decedent.[2]

The amended complaint specifically alleges that, on April 20, 2024, Defendant Scott began pursuing the Decedent for erratic driving, escalating the situation by attempting to box in the

[2] As previously mentioned, the other officers (TWRA Officers John Dunn and Melinda Garner) who are parties to this lawsuit are the subject of another motion to dismiss.

Decedent's vehicle and making contact with it, despite the vehicle's low speed. Defendant Dunn joined the pursuit and positioned his vehicle head-on to block the Decedent's vehicle. After the vehicle stopped, Defendants Scott, Dunn, and Garner exited their vehicles with their firearms drawn.

The Decedent exited his vehicle with his hands raised, but Defendants Scott and Dunn "shouted aggressive commands, demanding he lie prone without giving him adequate time or opportunity to comply." (Amd. Cmplt. para 19.) After the Decedent exited his vehicle,

> 20. When Russell sat or kneeled on the ground, Scott deployed his Taser at Russell, using force prematurely and without exhausting less intrusive means of gaining compliance.
>
> 21. After the Taser probes were pulled out by Russell and proved ineffective, Scott escalated force by deploying pepper spray and attempting a drive-stun with the Taser, despite Russell's apparent confusion and impairment.
>
> 22. Dunn holstered his firearm and physically grabbed Russell's arm, while Garner assisted in attempting to force Russell's arms behind his back, both applying prone restraint and pressure to Russell's back, a tactic known to risk positional asphyxia.
>
> 23. Russell, still impaired and unable to comply, was held face-down on the ground by Dunn and Garner, with Scott holding his cuffed arm, while officers continued to use force rather than adjust their tactics to his medical and mental state.
>
> 24. At one point, while Scott utilized his Taser to drive-stun Russell, Russell yelled: "I have heart problems! Stop!" Dunn and Garner continued to apply force to Russell, with Garner sitting on Russell's back while Dunn grabbed Russell's arms.
>
> 26. Despite the knowledge that Russell had "heart problems," the Defendants did not move him from his stomach and instead continued to restrain him in a prone position.

(Amd. Cmplt. paras. 20-26.) Thereupon,

> 28. Sgt. Blake Jenkins arrived and forcibly pulled Russell's remaining arm behind his back to complete handcuffing, further contributing to the dangerous prone restraint.

(*Id.* at para. 28.)

> Furthermore,
>
> 35. At or about 4:12, Daniel Russell presented his hands to officers for the purpose of being handcuffed and repeatedly made clear his willingness to cooperate.
>
> 36. Scott deployed the Taser at 5:07 after Russell had already presented his hands for handcuffing at 4:12 and explicitly asked "Can I just give you my hands?" at 4:19, demonstrating five minutes of compliance attempts before force escalation.
>
> 37. At or about 9:55 on the synchronized bodycam timeline, Russell was fully handcuffed and effectively immobilized; at this moment, he was face down, both arms secured, and had ceased all significant physical resistance, as established by both the video and contemporaneous officer statements.
>
> 38. Nevertheless, defendants Jenkins, Dunn, Scott, and others continued to apply substantial body weight and force to Russell's prone body for over 90 seconds after handcuffing.

(*Id.* at paras. 35-38.)

Plaintiff alleges that the "six-minute duration from first Taser use to death provided ample opportunity for intervention." (*Id.* at 43.) Additionally,

> 44. Within the timeline (from 7:35 onward), Russell audibly complained of heart problems and exhibited vocal distress. He was subdued, stopped moving, and showed labored or ceased breathing before ever being rolled over, in clear view of all defendants.
>
> 45. Despite these objectively recognizable signs of distress, no officer checked his breathing, pulse, or repositioned him to prevent asphyxia until after he was unresponsive.
>
> 46. At all relevant times described herein, and particularly after 4:37 on the synchronized timeline (when Russell was informed he was under arrest), Russell did not engage in any active, physical resistance as defined by Sixth Circuit precedent.
>
> 47. He presented his hands to be cuffed and repeatedly pled for mercy.
>
> 48. Once Russell was handcuffed and posed no threat, any continued application of force — be it prone pressure, Tasering, or repeated stuns — was excessive as a matter of clearly established law.
>
> 49. Russell expressly informed the officers that he suffered from heart problems.

(*Id.* at paras. 44-49.)

The amended complaint summarizes that, after exiting the vehicle, the Decedent made no attempt to flee or escape from police custody, he did not attempt to harm or threaten any of the officers, he made no disrespectful comments and did not insult any officer, he was not armed and there was no reason to believe that he was armed, and, at the time that force was used against him, he was no longer operating his vehicle and "posed no risk of vehicular flight or danger associated with the motor vehicle." (*Id.* at paras. 50-54.) The Decedent's "progression from compliance attempts (4:12-4:19) to force escalation (5:07) to medical emergency (7:35) to death (11:41) demonstrates a clear timeline where reasonable officers would have recognized the need to cease force and provide medical assistance." (*Id.* at para. 61.) Plaintiff alleges that the actions of Defendants "collectively demonstrate a pattern of excessive force, failure to accommodate a medical crisis, and deliberate indifference to Russell's constitutional rights, resulting in his preventable death." (*Id.* at para. 33.)

Plaintiff brings excessive force and deliberate indifference to serious medical needs claims against Defendant Scott and Jenkins. He also brings a failure to intervene against Defendants and a failure to supervise claim against Defendant Jenkins.

<u>Official Capacity Claims</u>

Defendants have moved to dismiss the official capacity claims brought against them. Plaintiff has not responded to this part of Defendants' motion. As stated by Defendants, when a plaintiff seeks to hold an individual officer liable in their official capacity, such claims are simply "another way of pleading an action against an entity of which [the] officer is an agent." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978). That is, "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity."

*Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *see also Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (determining that the only true defendants in the suit were the governmental entities, not the employees sued in their official capacity).

In this case, Plaintiff has sued Defendants Scott and Jenkins in their official capacities even though it has also sued Henry County, Tennessee. Because Plaintiff's official capacity claims are actually claims against Henry County, Plaintiff's official capacity claims against Defendants Scott and Jenkins are redundant and are, therefore, dismissed.

<u>Individual Claims</u>

Defendants contend that they are entitled to qualified immunity on Plaintiff's claims against them in their individual capacities. The parties agree as to the basic parameters of the law as to qualified immunity. The Sixth Circuit thoroughly reiterated those parameters in *Hodges v. City of Grand Rapids*.

> Qualified immunity protects public officials from suit unless "(1) ... the official violated a statutory or constitutional right, and (2) ... the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Id.* at 741, 131 S. Ct. 2074 (alterations in *al-Kidd*) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* The plaintiff ultimately bears the burden to show that the defendant public official is not entitled to qualified immunity, *Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019), but on a motion to dismiss, the question for the court is whether the plaintiff has plausibly alleged that the defendant violated a clearly established constitutional right. *Marvaso* [*v. Sanchez*], 971 F.3d [599,] 605 (6th Cir. 2020).
>
> Because qualified immunity is a defense to suit rather than liability, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Guertin*, 912 F.3d at 917 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). We have said, however, that this "point is usually

> summary judgment and not dismissal under Rule 12." *Id.* (quoting *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015)).
>
> The initial motion-to-dismiss question — whether a complaint pleads facts that, when presumed true, give rise to a plausible inference that the defendants violated a constitutional right — is fairly straightforward. And at summary judgment and trial the defendants will have an opportunity to demonstrate that the facts are not as the plaintiff pleaded them. But "analyzing the second prong of qualified immunity — whether the alleged constitutional violation is clearly established — 'is sometimes difficult' on the pleadings, since that 'inquiry may turn on case-specific details that must be fleshed out in discovery.'" *Myers v. City of Centerville*, 41 F.4th 746, 758 (6th Cir. 2022) (quoting *Crawford v. Tilley*, 15 F.4th 752, 765 (6th Cir. 2021)). "'Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is obvious or squarely governed by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." *Guertin*, 912 F.3d at 917 (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)).
>
> Indeed, "the application of qualified immunity today can turn on minute factual distinctions," *Crawford*, 15 F.4th at 765, particularly in light of Supreme Court precedent holding that, "in performing Fourth Amendment qualified immunity analysis, we must confine ourselves to 'the situation [the officer] confronted,' [and] carefully consider[ ] the 'particular factual context[ ]' at issue." *Hart v. Hillsdale County*, 973 F.3d 627, 642 (6th Cir. 2020) (first and fourth alterations in *Hart*) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). "That is hard to accomplish at the motion to dismiss stage." *Id.* "Oftentimes, we need a fuller factual picture to define the contours of the right at issue to determine if it was clearly established." *Diei v. Boyd*, 116 F.4th 637, 650 (6th Cir. 2024). Qualified immunity is, however, resolvable at the motion-to-dismiss stage "when the *complaint* establishes the defense." *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020).

*Hodges*, 139 F.4th at 504-05 (cleaned up) (emphasis in original).

Looking first at the excessive force claim against Defendants Scott and Jenkins, there is no doubt that a pre-trial detainee has a clearly established right to be free from excessive force under the Fourth Amendment.[3] *See e.g.*, *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001).

[3] All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a citizen are analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

Defendants define the issue as whether the Decedent had a "clearly established right" to be free from the specific force used by Defendants. *See Cannon v. Licking Cnty.*, 2019 WL 2567732, at *5 (S.D. Ohio June 21, 2019) ("The Fourth Amendment authorizes police officers to use force in effecting an arrest, 'but the question is ... whether [officers] could reasonably use the degree of force employed against the [suspect].'") According to Defendants, none of their actions (pepper spraying and tasing the Decedent, handcuffing him, and using pressure on his back after he was prone) constitute excessive force because the Decedent was actively resisting arrest. They cite various cases for the proposition that when a suspect actively resists arrest, the police can use a taser to subdue him, *see*, *e.g.*, *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015); when a suspect is actively resisting, the use of pepper spray is also reasonable, *see*, *e.g.*, *Williams v. Sandel*, 433 F. App'x 353, 361-63 (6th Cir. 2011); and officers are permitted to apply pressure to a resisting suspect's back, *see*, *e.g.*, *Wiley v. City of Columbus*, 36 F.4th 661, 665-66 (6th Cir. 2022).[4]

Defendants contend that the video clearly shows the Decedent resisting arrest and not obeying their commands, even when they threatened to tase him. They contend that, throughout the encounter, the Decedent remained noncompliant and that he was only moved to his stomach with Defendant Garner and later Defendant Jenkins positioned on his back so that he could be

[4] Defendants cite *Neague v. Cynkar* for the proposition that "[h]andcuffing an individual incident to an arrest is not a constitutional violation." (Mot. p. 10, ECF No. 43-1.) To the contrary, *Neague* clearly states, "a viable excessive force claim can be premised upon handcuffing. [*Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993)] (excessive force claim can be premised upon handcuffing if officer knew plaintiff had an injured arm and also knew plaintiff posed no threat); *see also Martin v. Heideman*, 106 F.3d 1308, 1312–13 (6th Cir. 1997) (overly tight application of handcuffs despite protestations of plaintiff can state excessive force claim); *Kostrzewa v. City of Troy*, 247 F.3d 633, 640–41 (6th Cir. 2001) (same)." 258 F.3d 507.

handcuffed.[5] Defendants' argument is based entirely on the premise that the Decedent was actively resisting arrest, and, therefore, they are qualifiedly immune from the excessive force claim.

On summary judgment, Defendants may prevail on their qualified immunity defense. However, the fallacy with Defendants' argument at this stage of the proceedings is that the video does not "blatantly contradict" or "utterly undermine" the allegations in the amended complaint that the Decedent was attempting to comply with the commands of the officers. The video shows the Decedent attempting to give his hands to the officers to be cuffed while asking "Can I just give you my hands?" Moreover, the video does not blatantly contradict Plaintiff's allegations that the Decedent made no attempt to flee the scene or escape from police custody at any point, did not attempt to harm, strike, or threaten any of the officers present, and did not make any verbal threats, disrespectful comments, or insults to the officers involved - that is, he was an unarmed man attempting to surrender.

The essence of Defendants' motion rests on their characterization that the Decedent "actively resisted," which presents the type of disputed factual scenario that the Sixth Circuit has cautioned against resolving at the motion to dismiss stage. *See Hodges*, 139 F.4th at 504-05 (instructing that "in performing Fourth Amendment qualified immunity analysis, we must confine ourselves to the situation [the officer] confronted [and] "that is hard to accomplish at the motion to dismiss stage"). *See also Singleton v. Kentucky*, 843 F.3d 238, 242 (6th Cir. 2016) (advising that "it is often perilous to resolve a Rule 12(b)(6) motion on qualified immunity grounds given the fact development often needed to decide whether the state official violated clearly established federal law.); *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021) (cautioning that "it is

---

[5] Defendants acknowledge that the Decedent's right arm was successfully handcuffed prior to his being "taken to the ground."

generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.")

The positions of the parties in this case are akin to those made in *Cannon v. Licking County.*

> The Defendants argue that Officers Meek and Green are entitled to qualified immunity because Ms. Cannon's rights were not violated by Officers Meek and Green. They contend that it is clearly established that officers can use escalated force on an individual they deem to be resisting arrest, and that Ms. Cannon's verbal hostility and arm movement during handcuffing constitutes resisting arrest and thus the takedown and strikes were warranted. Ms. Cannon counters that Officers Meek and Green are not entitled to qualified immunity because she was exposed to excessive force in violation of her constitutional rights. She contends that it is clearly established that an individual who is, at most, passively resisting arrest and poses little threat to law enforcement has a right to be free from a takedown and subsequent strikes.

*Cannon*, 2019 WL 2567732, at *5. The *Cannon* Court ultimately concluded that "[t]he facts in this case present a 'he said, she said' scenario where the outcome largely depends on whose story one believes. In these types of situations, a jury is best equipped to decide which set of facts to believe." *Id.*[6]

Because the amended complaint plausibly alleges that Defendants' conduct violated the clearly established constitutional rights of the Decedent of which a reasonable person would have known, their motion to dismiss the excessive force claim on qualified immunity grounds is denied; any qualified immunity determination must await summary judgment when a complete factual record has been developed.

Plaintiff has brought a failure to supervise claim against Defendant Jenkins. Plaintiff alleges that:

---

[6] The Court is mindful that *Cannon* involved a motion for summary judgment. However, that case illustrates the need to have a factual record developed before the issue of qualified immunity is decided.

> 97. Jenkins, as the ranking and supervising officer on scene, failed to direct subordinate officers (including Dunn, Garner, and Scott) to discontinue unnecessary or dangerous restraint tactics once Russell was handcuffed and non-resistant.
>
> 98. Jenkins failed to order or coordinate timely medical intervention, including repositioning and vital sign checks per well-established protocols, thereby breaching his supervisory responsibilities and directly contributing to the excessive force and medical neglect sustained by Russell.

(Amd. Cmplt. paras. 97-98.)

The doctrine of respondeat superior, or the right to control employees, does not apply in § 1983 actions to impute liability onto supervisors. *Monell*, 436 U.S. at 691; *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 80-81 (6th Cir. 1995). "Because § 1983 liability cannot be imposed under a theory of respondeat superior, proof of personal involvement is required for a supervisor to incur personal liability." *Miller v. Calhoun Cty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005). There is no respondeat superior liability when the plaintiff alleges only that the defendant merely failed to act or control employees. *Shorts v. Bartholomew*, 255 F. App'x 46, 53 (6th Cir. 2007); *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998). Because § 1983 is an individual liability statute, the plaintiff bears the burden of "specifically linking the officer's involvement to the constitutional infirmity." *Przybysz v. City of Toledo*, 746 F. App'x 480, 483 (6th Cir. 2018). A duty to protect an arrestee from excessive force arises when the officer: (1) observed or had reason to know that excessive force would be or was being used; and (2) had the opportunity and means to prevent the excessive use of force. *See Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013).

Defendant Jenkins first argues that he cannot be held liable for the actions of Defendants Garner or Dunn because they are both TWRA agents, not Henry County employees. While that argument may be correct, the allegation is that those defendants were subordinate to Defendant

Jenkins. During discovery, the parties will have the opportunity to determine the exact supervisory/subordinate relationship among the parties.

Next, Defendant Jenkins contends that he was not present when Defendant Scott applied pressure to the Decedent. However, Plaintiff points to video footage in which it appears that Defendant Jenkins grabbed the Decedent while Defendant Scott applied force to the Decedent's neck. Accordingly, the Court cannot find that the video blatantly contradicts the allegations of the amended complaint that Defendant Jenkins was present and "had personal involvement in the alleged misconduct." *C.f. Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005) (treating a failure to supervise claim as an "official capacity" claim when the plaintiff did not allege that the defendants had "personal involvement in the alleged misconduct").

Finally, Defendant Jenkins argues that the force used by Defendant Scott was not unreasonable because the Decedent was "actively resisting arrest" and, thus, he cannot be held liable for Defendant Scott's actions. The fallacy with this argument is that the Court has already determined that the amended complaint plausibly alleges that Defendants' actions constituted actionable excessive force and that the video evidence does not blatantly contradict those allegations. The Court emphasizes that the only determination it must make is whether Plaintiff has plausibly alleged a failure to supervise claim – not whether Plaintiff can prove the claim at trial or even withstand summary judgment. Accordingly, the portion of the motion seeking to dismiss the failure to supervise claim against Defendant Jenkins as to the excessive force claim is denied.

As for Plaintiff's claim that Defendant Jenkins's failure to supervise the other officers during the Decedent's medical emergency ("Jenkins failed to order or coordinate timely medical intervention, including repositioning and vital sign checks per well-established protocols, thereby

breaching his supervisory responsibilities and directly contributing to the excessive force and medical neglect sustained by Russell" (Amd. Cmplt. para. 98)), this claim must be dismissed because, as discussed below, Plaintiff has failed to state a viable deliberate indifference to medical needs claim.

Plaintiff has also asserted a failure to intervene claim against Defendants. It appears that Plaintiff's failure to supervise claim against Defendant Jenkins overlaps with his failure to intervene claim. *See*, *e.g.*, *Frederick v. Sheahan*, 2015 WL 4251179, at *3 (W.D.N.Y. July 13, 2015). Plaintiff alleges both that Defendant Jenkins himself used excessive force against the Decedent and that he "failed to direct subordinate officers (including Dunn, Garner, and Scott) to discontinue unnecessary or dangerous restraint tactics once Russell was handcuffed and non-resistant." (Amd. Cmplt. para. 97.)

Defendant Jenkins suggests that he cannot be held liable on a failure to intervene claim because Plaintiff has also brought an excessive force claim against him.

> As an initial matter, Jenkins cannot be liable for failing to intervene when he used force himself. Failure to intervene claims only apply to "nearby officer[s] who do[] not actively participate in the use of excessive force." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 493 (6th Cir. 2020). Therefore, where officers are direct participants in the use-of-force incident, they cannot also be redundantly liable for failing to intervene.

(Mot. p. 13, ECF No. 43-1.) Defendants have misunderstood the holding of *Pineda*. That Court specifically found that "a nearby officer who does not actively participate in the use of excessive force may still violate the Fourth Amendment if the officer fails to intervene to stop a fellow officer's use of such force." *Id.* at 493. The Court did not hold that, if the officer had participated, he could not be found liable on a failure to intervene claim.

Defendant also cites *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020), for the proposition that a plaintiff cannot bring both an excessive force claim and a failure to intervene

claim based on the same incident. That is not the holding in *Wright*. Instead, the *Wright* Court held that a failure to intervene claim could not be brought against an officer who did not have the opportunity and means to prevent another officer from pepper spraying the plaintiff because the officer was occupied trying to gain control of the plaintiff.

> Wright further claims that both Flagg and Williams failed to intervene to protect him from alleged excessive force committed by the other. In order to establish such a claim, Wright must prove that "the officer observed or had reason to know that the excessive force would be or was being used and that the officer had both the opportunity and the means to prevent the harm from occurring." *Smith* [*v. City of Troy*], 874 F.3d [938,] 945–46 [(6th Cir. 2017] (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Wright maintains that because the officers were "practically on top of each other" when they used the allegedly excessive force of the taser and pepper spray, each officer had the opportunity to prevent the other from using force. However, we are not persuaded that the evidence would allow a reasonable juror to find a constitutional violation as to either of these failure-to-intervene claims.
>
> In *Smith*, we held that when one officer was "occupied trying to gain control of [the plaintiff's] arms while [the other officer] was deploying his taser," no reasonable juror could find that the officer had the opportunity and the means to prevent the excessive force. 874 F.3d at 946. So too here. Although Wright is correct that the officers were in close proximity to each other, the body-cam footage from both Flagg and Williams shows that when Williams used pepper spray on Wright, Flagg was struggling with Wright in an attempt to remove him from the car. Like the officer in Smith, at the time Williams used his pepper spray, Flagg was preoccupied with attempting to detain Wright. The body-cam footage shows Flagg grappling with Wright's arms when Williams reached into the car to deploy the pepper spray. This all happened within a span of approximately ten seconds. Therefore, similar to the court's holding in *Smith*, we hold that no reasonable juror could find that Flagg had the opportunity and means to prevent Williams from using pepper spray. *See id.*

*Wright*, 962 F.3d at 872 (record citations omitted).

In this case, Plaintiff specifically alleges that:

> 41. After 9:55, Jenkins, Scott, Dunn, and at least one unnamed deputy were not continuously engaged in restraining Russell, as bodycam footage and officer statements confirm (e.g., 10:08 shows multiple officers standing by and observing while force was applied).

> 42. These officers had sufficient opportunity to perceive the danger and intervene but failed to act.
>
> 43. The six-minute duration from first Taser use to death provided ample opportunity for intervention.

(Amd. Cmplt. paras. 41-43.)

Defendant also reverts to his argument that the other officers' use of force while Defendant Jenkins was present was not excessive. The Court has already determined that the factual record has not been developed sufficiently in order to decide that issue. Accordingly, the Court finds that Plaintiff has plausibly alleged a failure to intervene claim against Defendant Jenkins and Defendant Scott.

As for Plaintiff's deliberate indifference claim, he has alleged:

> 29. After Russell was fully restrained, officers failed to immediately check his vital signs or reposition him, instead focusing on moving him to a patrol car, demonstrating deliberate indifference to his medical needs.
>
> 30. Within minutes, Russell became unresponsive, and Jenkins administered two doses of Narcan, incorrectly assuming an opioid overdose, while no officer initiated CPR or proper airway management.
>
> 31. EMS arrived and transported Russell to the hospital, where he was pronounced dead, with the autopsy later confirming death by cardiopulmonary arrest due to law enforcement restraint with back compression.
>
> …
>
> 39. During restraint, Russell audibly and repeatedly cried out, 'Oww! I have heart problems! Stop!' (7:35), making officers aware of a serious preexisting medical condition.
>
> 40. Despite these pleas, officers neither repositioned Russell nor checked his vital signs, and continued exerting force that restricted his breathing and increased risk of cardiac incident.

(*Id.* at paras. 29-31, 39-40.)

The autopsy report of the Office of the Medical Examiner in Nashville, Tennessee, concluded that the Decedent's manner of death was "homicide," and that the "cause of death" was "cardiopulmonary arrest during law enforcement subdual and restraint with back compression." The autopsy further concluded: "review of available body camera footage showed the decedent stop breathing during law enforcement restraint." The medical examiner presented the autopsy findings to a "consensus committee" attended by several medical professionals, and the committee agreed with the medical examiner's findings. (*Id.* at paras. 57-58.)

Under the Fourteenth Amendment, persons detained by law enforcement "have an established right to medical care 'that is analogous to the right of prisoners under the Eighth Amendment.'" *Hodges v. Abram*, 138 F.4th 980, 987 (6th Cir. 2025) (quoting *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009)) "An officer violates that right if they show 'deliberate indifference to a pretrial detainee's serious medical needs.'" *Id.* (quoting *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022)) (alterations in original). A pretrial detainee must satisfy two elements for a claim based on deliberate indifference to a medical need under the Fourteenth Amendment: (1) he "had a sufficiently serious medical need and (2) that each defendant acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 317 (6th Cir. 2023) (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021) (internal quotation marks omitted)). That is, a pretrial detainee alleging deliberate indifference to his serious medical needs "must prove 'more than negligence but less than subjective intent — something akin to reckless disregard.'" *Brawner*, 14 F.4th at 596 (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

In the present case, Plaintiff alleges that Defendants showed deliberate indifference by ignoring the Decedent's explicit complaints of heart problems and subsequently continuing dangerous restraint techniques despite those complaints. Defendant Jenkins points out that he was not present when the Decedent made his complaints and, thus, cannot be held liable on the deliberate indifference claim. Plaintiff has not disputed this assertion, and the amended complaint indicates that Defendant Jenkins arrived after the Decedent mentioned his heart problems. (Compare paragraph 24 "At one point, while Scott utilized his Taser to drive-stun Russell, Russell yelled: 'I have heart problems! Stop!'" and paragraph 28 "Sgt. Blake Jenkins arrived and forcibly pulled Russell's remaining arm behind his back to complete handcuffing, further contributing to the dangerous prone restraint.") Accordingly, because Defendant Jenkins was unaware of Decedent's heart problem complaints, he cannot be held liable on the deliberate indifference claim.

The Court finds that Defendant Scott is entitled to qualified immunity on this claim because Plaintiff has not met his burden to show that Defendant Scott acted with reckless disregard toward his serious medical needs. The amended complaint itself shows that, as soon as the Decedent became unresponsive, he was moved to his back, Defendant Jenkins administered two doses of Narcan, mistakenly assuming an opioid overdose, paramedics were called within seconds, and the Decedent was taken to the hospital. Thus, Defendant Scott is qualifiedly immune on Plaintiff's deliberate indifference claim.

*Monell* Liability

Plaintiff also brings a claim against Henry County based on the alleged inadequate training of its officers. In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities could be subject to § 1983 actions under the Fourteenth Amendment for alleged constitutional violations in a narrow set of circumstances. "A municipality

may not be held liable under § 1983 on a respondeat superior theory – in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691 (emphasis in original)). A plaintiff must show that "through its deliberate conduct" the entity was the "moving force" behind the injury alleged. *Allman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). That is, the plaintiff must prove that the entity had a "policy or custom" that caused a violation of his or her rights. *Monell*, 436 U.S. at 694.

A successful *Monell* claim can rest on different theories of liability, including the existence of a policy of inadequate training. To establish this type of claim, a plaintiff must show that: "1) the [municipality's] training program was inadequate for the tasks that [its employees] must perform; 2) the inadequacy was the result of the [municipality's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019) To establish deliberate indifference, a plaintiff must normally show "prior instances of unconstitutional conduct demonstrating that the [municipality] had notice that the training was deficient and likely to cause injury but ignored it." *Id.* at 836 (internal quotations omitted). In very narrow instances, however, a plaintiff may prove deliberate indifference with "evidence of a single violation of federal rights by a showing that the [municipality] had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Id.* (internal quotations omitted). *See also Morningstar v. Worthy*, 454 F. App'x 391, 406 (6th Cir. 2011) (noting that single-event liability arises only when the civil rights violation "was a highly predictable, or plainly obvious, consequence of the City's failure to train").

In the present case, Plaintiff has alleged that Defendant Henry County "exhibited deliberate indifference by failing to train law enforcement officers on positional asphyxia risks, directly causing Daniel Russell's death."[7] (Amd. Cmplt. para. 102.) Plaintiff further alleges that Defendant's "written policies did not require officers to reposition prone, handcuffed detainees or to check their breathing and vitals during or after restraint, despite well-documented national and DOJ guidance identifying these as critical steps in preventing positional asphyxia since at least 1995." (*Id.* at para. 104.) "Despite extensive prior national publicity on deaths from positional asphyxia — including multiple incidents featured by law enforcement periodicals, DOJ bulletins, and the IACP — the County did not offer or require any specific training or refresher on positional asphyxia for its deputies at any time before Russell's death." (*Id.* at para. 109.) It is further alleged that Defendant's failure to train the individual defendant officers with respect to the risks of positional asphyxia and the proper techniques to be used to avoid positional asphyxia was the moving force behind the decedent's death due to positional asphyxia. (*Id.* at paras. 112-115.)

Defendant posits that, based on Supreme Court and Sixth Circuit precedent, failing to train on "such a specific topic" does not meet the "narrow range" of circumstances when a single-violation theory is plausible. However, the cases cited by Defendant as examples of when a plaintiff's single violation theory failed (*Winkler v. Madison Cty.*, 893 F.3d 877 (6th Cir. 2018); *Jones v. Lacey*, 108 F. Supp. 3d 573 (E.D. Mich. June 5, 2015); *Hicks v. Scott*, 2023 WL 3171675 (S.D. Ohio Mar. 31, 2023), *aff'd*, 2024 WL 4360652 (6th Cir. Oct. 1, 2024)) are inapposite because those cases were decided on motions for summary judgment – not a motion to dismiss as in this case – and Defendant has made no effort to explain to the Court how the case holdings are

---

[7] "Asphyxia is a decrease in blood oxygen levels or an increase in blood carbon dioxide levels — either of which can kill. Positional asphyxia is asphyxia that results from body position." *Turner v. City of Toledo*, 2012 WL 1669836, at *3 n.3 (N.D. Ohio May 14, 2012) (citation omitted).

applicable to the present motion. It is a basic tenet of the Federal Rules of Civil Procedure that different standards of review are used for motions brought under Rule 12(b)(6) as opposed to those brought under Rule 56. Defense counsel is strongly advised to consider those Rules and their standards of review before filing other motions in this Court.

Instead of making a factual determination as to the adequacy of Defendant's training, at this juncture the Court must decide whether Plaintiff has plausibly alleged that Defendant failed to train its officers with respect to the risks of positional asphyxia and the proper techniques to be used to avoid positional asphyxia and that this failure to train was the moving force behind the Decedent's death. Plaintiff has alleged that the need for positional asphyxia training was obvious to Defendant prior to the death of the Decedent given decades of Department of Justice warnings, national training protocols, and extensive medical literature documenting the respiratory dangers of prone positioning during arrests. Plaintiff further alleges that Defendant did not provide the necessary training and that the failure to train on this subject was the moving force behind the Decedent's death. The Court is not called upon to resolve any factual disputes, such as whether the officers actually received training on this topic and, if not, whether the failure to do played in role in the death. Instead, the Court must only determine whether Plaintiff has plausibly alleged a *Monell* claim. The Court finds that he has.

In *Silva v. Kreager*, 2026 WL 1045148 (N.D. Ohio Apr. 17, 2026), the Court was asked to determine whether the plaintiff should be allowed to amend the complaint to add allegations similar to those in this case. The defendant argued that an amendment would be futile under Fed. R. Civ. P. 15. The Court determined otherwise.

> Plaintiff asserts both Police Departments failed to provide officers meaningful guidance on prone restraint, on-ground restraint, and positional asphyxia despite placing officers in situations where such use of force decisions predictably arise. Plaintiff alleges both Police Departments provided no meaningful policy or training

> on prone restraint despite the recognized constitutional danger associated with such force, and failed to supervise officer use of those techniques. Because officers routinely confront physical restraint situations, and because prone restraint presents a known risk of serious constitutional harm, Plaintiff plausibly alleges an obvious need for training. At this stage, those factual allegations support a plausible *Monell* claim under a failure to train theory even where Plaintiff identifies only one instance of allegedly excessive force.

*Silva*, 2026 WL 1045148, at *6–7 (internal citations omitted). This Court agrees with the *Silva* Court that "[a]t this stage, those factual allegations support a plausible *Monell* claim under a failure to train theory even [though] Plaintiff identifies only one instance of allegedly excessive force." Accordingly, the portion of the motion seeking to dismiss the *Monell* claim is denied.

## Summary and Conclusion

The motion to dismiss of Defendants Jenkins and Scott is **PARTIALLY GRANTED** and **PARTIALLY DENIED**. The motion is granted as to the official capacity claims, on the deliberate indifference claim against Defendants Jenkins and Scott, and on the failure to supervise claim against Defendant Jenkins concerning the deliberate indifference claim. The motion is denied as to the excessive force claim against Defendants Jenkins and Scott, the failure to supervise claim against Defendant Jenkins concerning the excessive force claim, and the failure to intervene claim against Defendant Jenkins and Defendant Scott. The motion is also denied as to the *Monell* claim against Defendant Henry County.

IT IS SO ORDERED.

**s/ S. Thomas Anderson**
S. Thomas Anderson
United States District Judge

Date: August 24, 2026.