**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DANNY RUSSELL, as next friend to B.R. and next of kin to DANIEL JORDAN RUSSELL, deceased,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**FRANKIE SCOTT, BLAKE JENKINS, MIRANDA GARNER, and JOHN DUNN, in their individual and official capacities, and HENRY COUNTY, TENNESSEE,**<br><br>**Defendants.** | ) | **Case No. 1:25-cv-01100-STA-jay** |

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING MOTION TO DISMISS OF TWRA DEFENDANTS**

Plaintiff Danny Russell, next friend of B.R. and next of kin of Daniel Jordan Russell ("the Decedent"), filed this action pursuant to 42 U.S.C. § 1983, alleging that Defendants Frankie Scott, Blake Jenkins, John Dunn, and Miranda Garner, in their individual and official capacities, and Henry County, Tennessee, violated the Decedent's Fourth and Fourteenth Amendment rights while restraining the Decedent during a traffic stop and subsequent arrest. Defendants Dunn and Garner have filed a motion to dismiss (ECF No. 44), Plaintiff has filed a response to the motion (ECF No. 49), and Defendants have filed a reply to Plaintiff's response. (ECF No. 50.)[1]

[1] Defendants Jenkins and Scott have also filed a motion to dismiss (ECF No. 43) which is the subject of a separate order.

For the reasons set forth below, Defendants' motion is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.

Standard of Review

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the pleadings as true and construe all of the allegations in the light most favorable to the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992). Under *Twombly* and *Iqbal*, Rule 8(a)'s liberal "notice pleading" standard requires a complaint to contain more than a recitation of bare legal conclusions or the elements of a cause of action. Instead, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

The parties have submitted video footage of the events in question. Concerning video usage by a Court in ruling on a motion to dismiss, the Sixth Circuit has explained:

> In the motion-to-dismiss context, "we have consistently held that we may only consider ... video footage over the pleadings when 'the videos are clear and blatantly contradict[ ] or utterly discredit[ ] the plaintiff's version of events.'" *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024) (alterations in *Saalim*) (quoting *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022)). "This is because if a video clearly depicts a set of facts contrary to those alleged in the complaint, this makes a

> plaintiff's allegations implausible." *Id.* "But when the video does not blatantly contradict or utterly discredit the complaint, we do not consider it on [a] Rule 12 motion. Instead, as when assessing any motion made under Rule 12, we rely on the allegations in the pleadings alone." *Id.*

*Hodges v. City of Grand Rapids*, 139 F.4th 495, 506–07 (6th Cir. 2025). Therefore, in deciding Defendants' motion, the Court must "determine whether the officers' proffered video evidence blatantly contradicts or utterly discredits [Plaintiff's] allegations" concerning the underlying events. *Id.* at 507. "So long as their allegations are not blatantly contradicted or utterly undermined by video evidence, the plaintiff need only allege facts that give rise to the plausible inference that the defendants violated a clearly established right. The officers cannot escape this fundamental rule by arguing that the video shows a more complete picture of the events than the complaint; that is an argument for summary judgment or for trial." *Id.* at 509 (citations omitted). *See also Lovell v. Clermont Cnty. Sheriff's Off.*, No. 26-3031, 2026 WL 2241215, at *7 (6th Cir. Aug. 4, 2026) ("Even with video evidence, however, we must nonetheless 'view any relevant gaps or uncertainties left by the videos in the light most favorable to the [p]laintiff." (citations omitted)).

<u>Background/Analysis</u>

According to the amended complaint (ECF No. 35), on April 20, 2024, Defendant Scott, a Henry County Deputy Sheriff, initiated pursuit of the Decedent as the Decedent was driving erratically.[2] Defendant Dunn, a TWRA officer, joined the pursuit and positioned his vehicle head-on to block the Decedent's vehicle. After the vehicle stopped, Defendants Scott, Dunn, and Garner, another TWRA officer, exited their vehicles with their firearms drawn.

[2] As previously mentioned, the other officers (Henry County Officers Jenkins and Scott) who are parties to this lawsuit are the subject of another motion to dismiss.

The Decedent exited his vehicle with his hands raised, but Defendants Scott and Dunn "shouted aggressive commands, demanding he lie prone without giving him adequate time or opportunity to comply." (Amd. Cmplt. para 19.) After the Decedent exited his vehicle,

> 20. When Russell sat or kneeled on the ground, Scott deployed his Taser at Russell, using force prematurely and without exhausting less intrusive means of gaining compliance.
>
> 21. After the Taser probes were pulled out by Russell and proved ineffective, Scott escalated force by deploying pepper spray and attempting a drive-stun with the Taser, despite Russell's apparent confusion and impairment.
>
> 22. Dunn holstered his firearm and physically grabbed Russell's arm, while Garner assisted in attempting to force Russell's arms behind his back, both applying prone restraint and pressure to Russell's back, a tactic known to risk positional asphyxia.
>
> 23. Russell, still impaired and unable to comply, was held face-down on the ground by Dunn and Garner, with Scott holding his cuffed arm, while officers continued to use force rather than adjust their tactics to his medical and mental state.
>
> 24. At one point, while Scott utilized his Taser to drive-stun Russell, Russell yelled: "I have heart problems! Stop!" Dunn and Garner continued to apply force to Russell, with Garner sitting on Russell's back while Dunn grabbed Russell's arms.
>
> 26. Despite the knowledge that Russell had "heart problems," the Defendants did not move him from his stomach and instead continued to restrain him in a prone position.

(Amd. Cmplt. paras. 20-26.) Thereupon,

> 28. Sgt. Blake Jenkins arrived and forcibly pulled Russell's remaining arm behind his back to complete handcuffing, further contributing to the dangerous prone restraint.

(*Id.* at para. 28.)

Furthermore,

> 35. At or about 4:12, Daniel Russell presented his hands to officers for the purpose of being handcuffed and repeatedly made clear his willingness to cooperate.

> 36. Scott deployed the Taser at 5:07 after Russell had already presented his hands for handcuffing at 4:12 and explicitly asked "Can I just give you my hands?" at 4:19, demonstrating five minutes of compliance attempts before force escalation.
>
> 37. At or about 9:55 on the synchronized bodycam timeline, Russell was fully handcuffed and effectively immobilized; at this moment, he was face down, both arms secured, and had ceased all significant physical resistance, as established by both the video and contemporaneous officer statements.
>
> 38. Nevertheless, defendants Jenkins, Dunn, Scott, and others continued to apply substantial body weight and force to Russell's prone body for over 90 seconds after handcuffing.

(*Id.* at paras. 35-38.)

Plaintiff alleges that the "six-minute duration from first Taser use to death provided ample opportunity for intervention." (*Id.* at 43.) Additionally,

> 44. Within the timeline (from 7:35 onward), Russell audibly complained of heart problems and exhibited vocal distress. He was subdued, stopped moving, and showed labored or ceased breathing before ever being rolled over, in clear view of all defendants.
>
> 45. Despite these objectively recognizable signs of distress, no officer checked his breathing, pulse, or repositioned him to prevent asphyxia until after he was unresponsive.
>
> 46. At all relevant times described herein, and particularly after 4:37 on the synchronized timeline (when Russell was informed he was under arrest), Russell did not engage in any active, physical resistance as defined by Sixth Circuit precedent.
>
> 47. He presented his hands to be cuffed and repeatedly pled for mercy.
>
> 48. Once Russell was handcuffed and posed no threat, any continued application of force — be it prone pressure, Tasering, or repeated stuns — was excessive as a matter of clearly established law.
>
> 49. Russell expressly informed the officers that he suffered from heart problems.

(*Id.* at paras. 44-49.)

The amended complaint summarizes that, after exiting the vehicle, the Decedent made no attempt to flee or escape from police custody, he did not attempt to harm or threaten any of the

officers, he made no disrespectful comments and did not insult any officer, he was not armed and there was no reason to believe that he was armed, and, at the time that force was used against him, he was no longer operating his vehicle and "posed no risk of vehicular flight or danger associated with the motor vehicle." (*Id.* at paras. 50-54.) The Decedent's "progression from compliance attempts (4:12-4:19) to force escalation (5:07) to medical emergency (7:35) to death (11:41) demonstrates a clear timeline where reasonable officers would have recognized the need to cease force and provide medical assistance." (*Id.* at para. 61.) Plaintiff alleges that the actions of Defendants "collectively demonstrate a pattern of excessive force, failure to accommodate a medical crisis, and deliberate indifference to Russell's constitutional rights, resulting in his preventable death." (*Id.* at para. 33.) Plaintiff brings excessive force and deliberate indifference to serious medical needs claims against Defendants and a failure to intervene claim.

Defendants contend that they are entitled to qualified immunity on Plaintiff's claims against them in their individual capacities. The parties agree as to the basic parameters of the law as to qualified immunity. The Sixth Circuit thoroughly reiterated those parameters in *Hodges v. City of Grand Rapids*.

> Qualified immunity protects public officials from suit unless "(1) ... the official violated a statutory or constitutional right, and (2) ... the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Id.* at 741, 131 S. Ct. 2074 (alterations in *al-Kidd*) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* The plaintiff ultimately bears the burden to show that the defendant public official is not entitled to qualified immunity, *Guertin v. Michigan*, 912 F.3d 907, 917 (6th Cir. 2019), but on a motion to dismiss, the question for the court is whether the plaintiff has plausibly alleged that the defendant violated a clearly established constitutional right. *Marvaso* [*v. Sanchez*], 971 F.3d [599,] 605 (6th Cir. 2020).

> Because qualified immunity is a defense to suit rather than liability, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Guertin*, 912 F.3d at 917 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). We have said, however, that this "point is usually summary judgment and not dismissal under Rule 12." *Id.* (quoting *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015)).
>
> The initial motion-to-dismiss question — whether a complaint pleads facts that, when presumed true, give rise to a plausible inference that the defendants violated a constitutional right — is fairly straightforward. And at summary judgment and trial the defendants will have an opportunity to demonstrate that the facts are not as the plaintiff pleaded them. But "analyzing the second prong of qualified immunity — whether the alleged constitutional violation is clearly established — 'is sometimes difficult' on the pleadings, since that 'inquiry may turn on case-specific details that must be fleshed out in discovery.'" *Myers v. City of Centerville*, 41 F.4th 746, 758 (6th Cir. 2022) (quoting *Crawford v. Tilley*, 15 F.4th 752, 765 (6th Cir. 2021)). "'Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is obvious or squarely governed by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." *Guertin*, 912 F.3d at 917 (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)).
>
> Indeed, "the application of qualified immunity today can turn on minute factual distinctions," *Crawford*, 15 F.4th at 765, particularly in light of Supreme Court precedent holding that, "in performing Fourth Amendment qualified immunity analysis, we must confine ourselves to 'the situation [the officer] confronted,' [and] carefully consider[ ] the 'particular factual context[ ]' at issue." *Hart v. Hillsdale County*, 973 F.3d 627, 642 (6th Cir. 2020) (first and fourth alterations in *Hart*) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). "That is hard to accomplish at the motion to dismiss stage." *Id.* "Oftentimes, we need a fuller factual picture to define the contours of the right at issue to determine if it was clearly established." *Diei v. Boyd*, 116 F.4th 637, 650 (6th Cir. 2024). Qualified immunity is, however, resolvable at the motion-to-dismiss stage "when the *complaint* establishes the defense." *Siefert v. Hamilton County*, 951 F.3d 753, 762 (6th Cir. 2020).

*Hodges*, 139 F.4th at 504-05 (cleaned up) (emphasis in original).

Looking first at the excessive force claim against Defendants Dunn and Garner, there is no doubt that a pre-trial detainee has a clearly established right to be free from excessive force under

the Fourth Amendment.[3] *See e.g.*, *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). However, did the Decedent have a "clearly established right" to be free from the specific force used by Defendants? *See Cannon v. Licking Cnty.*, 2019 WL 2567732, at *5 (S.D. Ohio June 21, 2019) ("The Fourth Amendment authorizes police officers to use force in effecting an arrest, 'but the question is ... whether [officers] could reasonably use the degree of force employed against the [suspect].'") According to Defendants, none of their actions constitute excessive force because the Decedent was actively resisting arrest.

Defendants contend that the video clearly shows the Decedent resisting arrest and not obeying their commands, even when they threatened to tase him. They contend that, throughout the encounter, the Decedent remained noncompliant and that he was only moved to his stomach with Defendant Garner and later Defendant Jenkins positioned on his back so that he could be handcuffed. Defendants' argument is based entirely on the premise that the Decedent was actively resisting arrest, and, therefore, they are qualifiedly immune from the excessive force claim.

On summary judgment, Defendants may prevail on their qualified immunity defense. However, the fallacy with Defendants' argument at this stage of the proceedings is that the video does not "blatantly contradict" or "utterly undermine" the allegations in the amended complaint that the Decedent was attempting to comply with the commands of the officers. The video shows the Decedent attempting to give his hands to the officers to be cuffed while asking "Can I just give you my hands?" Moreover, the video does not blatantly contradict Plaintiff's allegations that the Decedent made no attempt to flee the scene or escape from police custody at any point, did not attempt to harm, strike, or threaten any of the officers present, and did not make any verbal threats,

---

[3] All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a citizen are analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989).

disrespectful comments, or insults to the officers involved - that is, he was an unarmed man attempting to surrender.

The essence of Defendants' motion rests on their characterization that the Decedent "actively resisted," which presents the type of disputed factual scenario that the Sixth Circuit has cautioned against resolving at the motion to dismiss stage. *See Hodges*, 139 F.4th at 504-05 (instructing that "in performing Fourth Amendment qualified immunity analysis, we must confine ourselves to the situation [the officer] confronted [and] "that is hard to accomplish at the motion to dismiss stage"). *See also Singleton v. Kentucky*, 843 F.3d 238, 242 (6th Cir. 2016) (advising that "it is often perilous to resolve a Rule 12(b)(6) motion on qualified immunity grounds given the fact development often needed to decide whether the state official violated clearly established federal law.); *Anders v. Cuevas*, 984 F.3d 1166, 1175 (6th Cir. 2021) (cautioning that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.")

The positions of the parties in this case are akin to those made in *Cannon v. Licking County*.

> The Defendants argue that Officers Meek and Green are entitled to qualified immunity because Ms. Cannon's rights were not violated by Officers Meek and Green. They contend that it is clearly established that officers can use escalated force on an individual they deem to be resisting arrest, and that Ms. Cannon's verbal hostility and arm movement during handcuffing constitutes resisting arrest and thus the takedown and strikes were warranted. Ms. Cannon counters that Officers Meek and Green are not entitled to qualified immunity because she was exposed to excessive force in violation of her constitutional rights. She contends that it is clearly established that an individual who is, at most, passively resisting arrest and poses little threat to law enforcement has a right to be free from a takedown and subsequent strikes.

*Cannon*, 2019 WL 2567732, at *5. The *Cannon* Court ultimately concluded that "[t]he facts in this case present a 'he said, she said' scenario where the outcome largely depends on whose story one

believes. In these types of situations, a jury is best equipped to decide which set of facts to believe." *Id.*[4]

Because the amended complaint plausibly alleges that Defendants' conduct violated the clearly established constitutional rights of the Decedent of which a reasonable person would have known, their motion to dismiss the excessive force claim on qualified immunity grounds is denied; any qualified immunity determination must await summary judgment when a complete factual record has been developed.

Plaintiff has also asserted a failure to intervene claim against Defendants. Plaintiff alleges that Defendant Dunn should have intervened to stop Defendant Scott's repeated and escalating use of the taser and pepper spray. (Amd. Cmplt. para. ¶64.) And he alleges that Defendant Garner should have intervened to stop the excessive force used by Scott and Dunn. (*Id.* at para. 73.)

Plaintiff specifically alleges that:

> 41. After 9:55, Jenkins, Scott, Dunn, and at least one unnamed deputy were not continuously engaged in restraining Russell, as bodycam footage and officer statements confirm (e.g., 10:08 shows multiple officers standing by and observing while force was applied).
>
> 42. These officers had sufficient opportunity to perceive the danger and intervene but failed to act.
>
> 43. The six-minute duration from first Taser use to death provided ample opportunity for intervention.
>
> …
>
> 64. At several key moments observed on body camera footage — including during Scott's repeated Taser deployments and the administration of pepper spray — Dunn was in close proximity, not physically occupied with restraint, and had both the opportunity and duty to intervene to stop Scott's unnecessary and escalating force but failed to take reasonable steps to protect Russell.

[4] The Court is mindful that *Cannon* involved a motion for summary judgment. However, that case illustrates the need to have a factual record developed before the issue of qualified immunity is decided.

> …
>
> 67. Dunn's continued application of force and failure to intervene in the face of obvious medical risk displayed deliberate indifference to Russell's serious medical needs, especially as he made no attempt to alert EMS or direct immediate medical attention once Russell became unresponsive.
>
> …
>
> 79. At multiple moments evident on the synchronized video — particularly after Scott and Dunn had stopped active restraint — Garner was in a position to, and had the means and opportunity to, intervene to stop the ongoing excessive force by her fellow officers, but instead, she continued to maintain her own weight and pressure on Russell, failing to intervene in violation of her clearly established duty.

(Amd. Cmplt. paras. 41-43, 64, 67, 79.)

Defendants also revert to the argument that the other officers' use of force was not excessive. The Court has already determined that the factual record has not been developed sufficiently in order to decide that issue. Accordingly, the Court finds that Plaintiff has plausibly alleged a failure to intervene claim against Defendants Dunn and Garner.

As for Plaintiff's deliberate indifference claim, he has alleged:

> 29. After Russell was fully restrained, officers failed to immediately check his vital signs or reposition him, instead focusing on moving him to a patrol car, demonstrating deliberate indifference to his medical needs.
>
> 30. Within minutes, Russell became unresponsive, and Jenkins administered two doses of Narcan, incorrectly assuming an opioid overdose, while no officer initiated CPR or proper airway management.
>
> 31. EMS arrived and transported Russell to the hospital, where he was pronounced dead, with the autopsy later confirming death by cardiopulmonary arrest due to law enforcement restraint with back compression.
>
> …
>
> 39. During restraint, Russell audibly and repeatedly cried out, 'Oww! I have heart problems! Stop!' (7:35), making officers aware of a serious preexisting medical condition.

> 40. Despite these pleas, officers neither repositioned Russell nor checked his vital signs, and continued exerting force that restricted his breathing and increased risk of cardiac incident.

(*Id.* at paras. 29-31, 39-40.)

The autopsy report of the Office of the Medical Examiner in Nashville, Tennessee, concluded that the Decedent's manner of death was "homicide," and that the "cause of death" was "cardiopulmonary arrest during law enforcement subdual and restraint with back compression." The autopsy further concluded: "review of available body camera footage showed the decedent stop breathing during law enforcement restraint." The medical examiner presented the autopsy findings to a "consensus committee" attended by several medical professionals, and the committee agreed with the medical examiner's findings. (*Id.* at paras. 57-58.)

Under the Fourteenth Amendment, persons detained by law enforcement "have an established right to medical care 'that is analogous to the right of prisoners under the Eighth Amendment.'" *Hodges v. Abram*, 138 F.4th 980, 987 (6th Cir. 2025) (quoting *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009)) "An officer violates that right if they show 'deliberate indifference to a pretrial detainee's serious medical needs.'" *Id.* (quoting *Hyman v. Lewis*, 27 F.4th 1233, 1237 (6th Cir. 2022)) (alterations in original). A pretrial detainee must satisfy two elements for a claim based on deliberate indifference to a medical need under the Fourteenth Amendment: (1) he "had a sufficiently serious medical need and (2) that each defendant acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Helphenstine v. Lewis Cnty., Kentucky*, 60 F.4th 305, 317 (6th Cir. 2023) (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 596 (6th Cir. 2021) (internal quotation marks omitted)). That is, a pretrial detainee alleging deliberate indifference to his serious medical needs "must prove 'more than negligence but less than subjective intent —

something akin to reckless disregard.'" *Brawner*, 14 F.4th at 596 (quoting *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

In the present case, Plaintiff alleges that Defendants showed deliberate indifference by ignoring the Decedent's explicit complaints of heart problems and subsequently continuing dangerous restraint techniques despite those complaints. The Court finds that Defendants are entitled to qualified immunity on this claim because Plaintiff has not met his burden to show that Defendants acted with reckless disregard toward his serious medical needs. The amended complaint itself shows that, as soon as the Decedent became unresponsive, he was moved to his back, Defendant Jenkins administered two doses of Narcan, mistakenly assuming an opioid overdose, paramedics were called within seconds, and the Decedent was taken to the hospital. Thus, Defendants are qualifiedly immune on Plaintiff's deliberate indifference claim.

Summary and Conclusion

The motion to dismiss of Defendants Dunn and Garner is **PARTIALLY GRANTED** and **PARTIALLY DENIED**. The motion is granted as to the deliberate indifference claim. The motion is denied as to the excessive force claim against Defendants and the failure to intervene claim.

IT IS SO ORDERED.

s/ S. Thomas Anderson
S. Thomas Anderson
United States District Judge

Date: August 24, 2026